# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

JEFFREY NICHOLS,

    Plaintiff,

        v.                CASE NO. 3:22-CV-703-SJF

WADE A WALLACE,

    Defendant.

## OPINION and ORDER

Plaintiff Jeffrey Nichols filed this case on August 29, 2022, after Defendant Officer Wade Wallace pulled him over for traffic violations on January 13, 2021. Plaintiff brings claims under 42 U.S.C. §§ 1981 and 1983, contending that, during the traffic stop, Officer Wallace violated Plaintiff's rights under the Fourth, Fifth, and Fourteenth Amendments of the U.S. Constitution. Plaintiff alleges that Defendant conducted the traffic stop without reasonable suspicion and that, as a result, Plaintiff was unlawfully detained for about 25 minutes. Plaintiff also contends that Defendant's actions were racially motivated.

Defendant has moved for summary judgment on all of Plaintiff's claims, which Plaintiff has opposed.[1] The Court issues the following opinion and order based on the

---

[1] Under this Court's local rules, a party moving for summary judgment must separately file (1) a motion; (2) a supporting brief; (3) a statement of material facts with numbered paragraphs for each material fact the moving party contends is undisputed which includes (A) a short statement of each fact; and (B) a citation to evidence supporting each fact. N.D. Ind. L.R. 56-1(a). A party opposing summary judgment must separately file: (1) a response brief and (2) a Response to Statement of Material Facts that (A) restates verbatim the Statement of Facts, (B) a correspondingly numbered response immediately following each paragraph of the Statement of Facts, (C) a citation to evidence supporting each dispute of

parties' consent under 28 U.S.C. § 636(c). [*See* DE 7, DE 21]. For the reasons below, Defendant's Motion is granted.

## I.    FACTS

On January 13, 2021, Plaintiff was driving westbound on Interstate 94 near mile marker 43 in Michigan City, Indiana. [DE 16 at 1, ¶ 1]. Defendant, on duty for the LaPorte County Sheriff's Interdiction Traffic Enforcement Unit that day, was parked in the median of the interstate in his marked police vehicle. [*Id.*] Defendant began to follow Plaintiff after observing that Plaintiff appeared to be traveling at a speed greater than the speed limit of 70 miles per hour and after observing that Plaintiff merged "quickly" from the far inside lane to the center lane "without signaling 300 feet prior to changing lanes." [*Id.* at 1, ¶ 1–2]. Then, after pacing his vehicle with Plaintiff's, Defendant's "speedometer and [dash-mounted] radar" reflected a speed of 77 miles per hour. [*Id.* ¶ 3]. Defendant again observed "Plaintiff merge to the far outside lane of travel" without signaling for 300 feet. [*Id.* at 2, ¶ 4]. Defendant then pulled Plaintiff over. [*Id.* ¶ 5].

Plaintiff disputes that he was speeding or that he made unsafe lane changes. Plaintiff maintains that his cruise control was "set at 70 miles per hour." [DE 17-1 at 2, ¶

---

fact, and (D) additional facts in a section titled Additional Material Facts with numbered paragraphs continuing the sequential numbing of the Statement of Material Facts for each additional material fact the opposing party contends is undisputed which includes both (i) a short statement of each fact, and (ii) a citation to evidence supporting each fact. N.D. Ind. L.R. 56-1(b). Plaintiff's response fails to meet these requirements because he did not individually file a response brief and a Response to Statement of Facts. Moreover, Plaintiff's Statement of Genuine Disputes section does not restate verbatim the Statement of Material Facts, use corresponding numbers, or cite evidence for each fact. In the interest of ruling on the merits of the arguments, the Court will consider the entirety of Plaintiff's response despite its deficiencies. *See Foman v. Davis*, 371 U.S. 178, 181 (1962).

6]. Plaintiff also contends that Defendant followed him for about 3 to 5 miles before activating his lights to pull Plaintiff over. [DE 17 at 3–4, ¶ 3]. Plaintiff explains that he noticed when Defendant began to follow him, and so after a mile or two, Plaintiff reduced his speed to 65 miles per hour. [*Id.* at 3–4, ¶ 3]. As to the lane changes, Plaintiff insists that he used his turn signals for both lane changes and that he waited at least 4 seconds before changing lanes. Plaintiff maintains that, because he was driving at 70 miles per hour, he drove at least 410 feet before changing lanes. [*Id.* at 3, ¶ 2]. Plaintiff states that he even asked Defendant to provide a recording that showed that he had been speeding or had failed to signal during the lane changes, but that Defendant declined to do so. [*Id.* at 4, ¶ 3].

Generally, traffic stops take between ten and twenty minutes to complete. [DE 15-1 at 3, ¶ 18]. Defendant alleges that the traffic stop was conducted through normal procedures and took about ten minutes, beginning at 1:43 p.m. and concluding at 1:53 p.m. [DE 16 at 2, ¶ 5, 6]. This duration was listed on the warning issued to Plaintiff. [DE 17]. Defendant states that throughout the traffic stop, "public safety precautions were followed to address the inherent concerns surrounding traffic stops on interstate highways as well as the COVID-19 global pandemic." [*Id.* at 2, ¶ 7]. At the time of the incident here, Defendant "routinely disinfected" his patrol vehicle and kept it "well-stocked with face masks which were made available to anyone who wanted one due to the COVID-19 pandemic." [DE 15-1 at 3, ¶ 16]. Defendant provides that it is common practice for him to invite people to sit in his patrol vehicle during traffic stops. [*Id.* at 3,

¶ 13; DE 18 at 4].  Accordingly, Defendant maintains that he invited Plaintiff to sit in the front seat of his patrol vehicle while he conducted the traffic stop. [DE 15-1 at 3, ¶13].

According to Defendant, Plaintiff did not "articulate or make any indication that he was uncomfortable sitting in the unlocked patrol [vehicle] or engaging in general conversation" nor did Plaintiff assert his Fifth Amendment rights during the stop. [DE 16 at 2, ¶ 8; DE 15-1 at 3, ¶ 19]. But Plaintiff alleges that he understood Defendant's invitation to sit in the patrol vehicle as an "order" to do so. [DE 17 at 5, ¶ 5]. Plaintiff insists that he "was fearful" that if he questioned Defendant's authority, that this "might provoke an angry, forceful or harmful response" from Defendant. [DE 17-1 at 3, ¶ 17]. Plaintiff thus insists that he felt that he "had no choice but to get out of the van and sit in his patrol vehicle." [*Id.*]. Still, Plaintiff does not contend that he asked whether it was an order, nor did he tell Defendant that he was uncomfortable. [DE 17 at 5, ¶ 5].

Plaintiff disputes that the traffic stop lasted only ten minutes, maintaining that his recollection is that it lasted around twenty-five minutes. [*Id.* at 5–6, ¶ 7]. Plaintiff insists that the times (1:43 p.m. and 1:53 p.m.) listed on the warning reflect only the times that Defendant called dispatch, not the actual duration of the traffic stop. [*Id.* at 6, ¶ 7]. Plaintiff alleges that when Defendant approached his vehicle, Defendant requested his driver's license and registration, which Plaintiff promptly produced. [DE 17-1 at 3, ¶ 15]. Plaintiff contends that once Defendant had Plaintiff's driver's license and vehicle rental agreement, Defendant needed nothing else to complete the stop. [DE 17 at 5, ¶ 7].

Plaintiff also contends that Defendant knew that Plaintiff was African American—as Plaintiff's windows are not tinted—and that Defendant did not offer a

4

"race neutral reason" for having Plaintiff sit in the patrol vehicle. [*Id.* at 5, ¶ 6; DE 17 at 9]. According to Plaintiff, sitting in the patrol vehicle also increased his fear that "he would contract [COVID-19] and prolong the stop." [*Id.* at 5, ¶ 6]. But Defendant maintains that at the time of the traffic stop, he was not "familiar with [] Plaintiff or his vehicle, nor was he able to ascertain" Plaintiff's race until after he approached his vehicle. [DE 16 at 2, ¶ 12].

Defendant issued Plaintiff a warning for speeding and failing to properly use turn signals. [DE 16 at 2, ¶ 11]. With only a warning issued, Plaintiff did not pay any fees. [*Id.*].

## II.   ANALYSIS

### A.   Legal Standard

Summary judgment is appropriate when the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). A "material" fact is one identified by the substantive law as affecting the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, (1986). A "genuine issue" exists regarding a material fact when "the evidence is such that a reasonable jury could return a verdict for the [nonmoving party]." *Id.* "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and

drawing all reasonable inferences in that party's favor. *Heft v. Moore,* 351 F.3d 278, 282 (7th Cir. 2003). Accordingly, the court's role "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is a material dispute that requires a trial." *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994). Indeed, the court is not "obligated to research and construct legal arguments for parties, especially when they are represented by counsel." *Nelson v. Napolitano,* 657 F.3d 586, 590 (7th Cir. 2011).

To overcome a motion for summary judgment, the nonmoving party cannot rest on the allegations or denials contained in his pleadings. Rather, the nonmoving party must present sufficient evidence to show the existence of each element of his case on which he will bear the burden at trial. *Celotex,* 477 U.S. at 322–23; *Modrowski v. Pigatto,* 712 F.3d 1166, 1168 (7th Cir. 2013). When a factual record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). In other words, "[s]ummary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory,* 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted); *see also Goodman v. Nat'l Sec. Agency, Inc.,* 621 F.3d 651, 654 (7th Cir. 2010).

**B.     Discussion**

Plaintiff brings claims under 42 U.S.C. §§ 1981 and 1983, contending that Defendant's actions violated Plaintiff's rights under the Fourth, Fifth, and Fourteenth Amendments of the U.S. Constitution. Defendant maintains that summary judgment should be granted on all claims because (1) there was no violation of Plaintiff's rights and, (2) even if there was a violation, Defendant is entitled to qualified immunity.[2]

To begin, Plaintiff admits that, in "the absence of clear authority, Defendant appears to be entitled to immunity on Plaintiff's claim that [Defendant's] questioning violated [Plaintiff's] 5th Amendment rights." [DE 17 at 8].  Accordingly, with no substantive response from Plaintiff, the Court can only find that Defendant is entitled to summary judgment on Plaintiff's Fifth Amendment claim.

The Court now considers Defendant's motion as to Plaintiff's Fourth and Fourteenth Amendment claims.

**1.     Violations of the Fourth and Fourteenth Amendment**

Plaintiff contends that Defendant's actions violated his Fourth Amendment right not to be pulled over without reasonable suspicion and not to have the traffic stop be unreasonably prolonged. He also contends that Defendant discriminated against him based on his race in violation of the Fourteenth Amendment. Defendant argues that he

---

[2] Defendant also argues that Plaintiff has experienced no concrete injury traceable to Defendant's conduct because he was only issued a warning, not a ticket, and thus lacks standing. [DE 15, 3–5]. But Defendant cites no authority to support this assertion, instead devoting most of his Memorandum in Support of Summary Judgment discussing other arguments. Accordingly, this Court deems this argument waived. *See United States v. Beavers*, 756 F.3d 1044, 1059 (7th Cir. 2014). "Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived."

is entitled to summary judgment because Plaintiff fails to properly raise a § 1983 claim, that Defendant did have reasonable suspicion to initiate the traffic stop, and that he did not notice Plaintiff's race before approaching his vehicle and thus could not have had a discriminatory intent.

Section 1983 vindicates "rights, privileges or immunities that are guaranteed by the U.S. Constitution or a federal statute." *Narducci v. Moore*, 572 F.3d 313, 318–19 (7th Cir. 2009). "To state a claim under Section 1983, a plaintiff must satisfy two elements[:] he must allege violation of rights secured by the Constitution and laws of the United States, and he must show a person acting under color of law committed the alleged deprivation." *Sims v. Marnocha*, 159 F. Supp. 2d 1133, 1136–37 (N.D. Ind. 2001) (citing *West v. Atkins*, 487 U.S. 42 (1988)). First, Defendant asserts that Plaintiff "cannot provide any evidence" to support his claim that Defendant's conduct during the traffic stop "deprived Plaintiff of any right, privilege or immunity secured by the Constitution or laws of the United States." [DE 15 at 2]. Second, though Defendant concedes that he was acting under color of law, he maintains that Plaintiff has not shown "a direct causal link between a municipal custom or policy" and the alleged deprivation of Plaintiff's rights. [DE 15 at 2–3]. The Court considers Defendant's second argument first.

Defendant relies on *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)[3], to support his contention that Plaintiff must show a direct causal link between a municipal custom or policy and the alleged violation of Plaintiff's rights. *Canton* considered whether "a

---

[3] *Canton* was abrogated in part on other grounds unrelated to this case by *Farmer v. Brennan*, 511 U.S. 825 (1994).

municipality can ever be liable under 42 U. S. C. § 1983 for constitutional violations resulting from its failure to train municipal employees." *Id.* at 380. The Court explained that "a municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue." *Id.* at 385 (internal citation *omitted).* As such, "'[i]t is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held liable under § 1983." *Id.* (citing *Springfield v. Kibbe,* 480 U.S. 257, 267 (1987)). *Canton* thus established t the first inquiry into an allegation of municipal liability must be "whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Id*.

But here, Plaintiff is not suing the police department that Defendant is employed by, nor is Plaintiff suing Defendant in his official capacity. Plaintiff is suing Defendant in his individual capacity. And when a state actor, a "person" within the meaning of Section 1983, is sued in his or her personal or individual capacity, "it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." *Hafer v. Melo,* 502 U.S. 21, 25 (1991) (citing *Kentucky v. Graham,* 473 U.S. 159, 166 (1985)). Thus, Plaintiff need not allege a "direct causal link between a municipal custom or policy" and his alleged Constitutional deprivations to bring his claims against Defendant. [DE 15 at 2].

With Defendant's second argument unpersuasive, the Court now returns Defendant's first argument: that Plaintiff fails to present evidence showing that Defendant violated his Fourth and Fourteenth Amendment rights. The Court addresses each claim in turn.

### a.    Fourth Amendment

Defendant maintains that he is entitled to summary judgment on Plaintiff's Fourth Amendment claim because the undisputed evidence shows that Defendant had reasonable suspicion to initiate the traffic stop against Plaintiff and that the stop was not unreasonably prolonged.

### i.    Reasonable Suspicion

Defendant alleges that the undisputed evidence shows that he observed Plaintiff commit three traffic violations before initiating the traffic stop: exceeding the speed limit of 70 mph and changing lanes without proper use of a turn signal twice in violation of Ind. Code § 9-21-8-25.[4] Plaintiff disputes this by maintaining that he was driving the speed limit while using cruise control and by maintaining that he used his turn signal correctly during both lane changes.

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const, Amend. 4. "Whenever police stop a vehicle, the stop must meet the [Fourth] Amendment's reasonableness requirement." *United States v. Lewis*, 920 F.3d 483, 489 (7th Cir. 2019) (citing *Delaware v. Prouse*, 440 U.S. 648, 663 (1979)). "Traffic stops are brief, like *Terry* stops, so they require only reasonable suspicion of a traffic violation—not probable cause." *Abbas v. City of Hobart, Indiana*, No. 2:21-CV-150-GSL-APR, 2024 WL

---

[4] "On January 13, 2021, prior to the statute's repeal [Repealed by P.L. 118-2022, SEC.23], Ind. Code § 9-21-8-25 read as follows: 'Sec. 25. A signal of intention to turn right or left shall be given continuously during not less than the last two hundred (200) feet traveled by a vehicle before turning or changing lanes. A vehicle traveling in a speed zone of at least fifty (50) miles per hour shall give a signal continuously for not less than the last three hundred (300) feet traveled by the vehicle before turning or changing lanes.'" [DE 15 at 4 n.2].

3508640, at *3 (N.D. Ind. July 22, 2024) (internal citations omitted). Thus, "[i]f an officer reasonably thinks he sees a driver commit a traffic violation, that is sufficient grounds to pull him over without offending the Constitution." *Lewis*, 920 F.3d at 489 (citing *United States v. Muriel*, 418 F.3d 720, 724 (7th Cir. 2005)). Moreover, "[w]hether the driver actually committed a traffic infraction is irrelevant for [Fourth] Amendment purposes so long as there was an objective basis for a reasonable belief he did." *Id.* (citing *United States v. Cashman*, 216 F.3d 582, 587 (7th Cir. 2000)).

Defendant relies on *United States v. Lewis* to show that Plaintiff's traffic stop was reasonable. In *Lewis*, an officer was watching traffic when he observed Lewis driving closely behind another vehicle. *Id.* at 486. The officer began following Lewis to see if he could confirm the distance. *Id.* The officer "calculated the time-distance[]" by activating a "stopwatch…to record the time between the truck's rear passing a milepost" and the front of Lewis's car passing the same milepost. *Id.* at 486. "He clocked this at 1.2 seconds, meaning Lewis followed 1.2 seconds behind the truck according to this calculation. Lewis stayed close behind the truck for about 45 seconds despite the lack of traffic immediately behind him." *Id.* The officer activated his emergency lights and pulled Lewis over. *Id.* During the stop the officer found heroin in Lewis' vehicle, and Lewis was then charged with possession of heroin with intent to distribute. *Id.* Lewis later moved the suppress the heroin, contending that the stop was unlawful, but his motion was denied. *Id.* On appeal, the court affirmed, finding that the officer "had more than ample grounds to pull Lewis over." *Id.* at 489. The court explained that the officer's initial observation that Lewis was driving behind the truck in front of him too closely

"alone probably satisfied the Constitution." *Id.* The court also explained that whether "Lewis actually followed [the truck] by 1.2 seconds exactly is irrelevant for purposes of the [4th] Amendment. It is enough that this calculation supported a reasonable belief Lewis was breaking the law." *Id.* Thus, the court in *Lewis* determined that the traffic stop initiated by the officer did not violate Lewis's Fourth Amendment rights. *Id.* A radar gun reading likewise has been found to support such a reasonable belief. *See United States v. Baker*, 78 F.3d 1241, 1244 (7th Cir. 1996) (finding than a officer's reading that "clocked [the defendant's car] going 77 miles per hour in a 65 mile per hour zone" gave the officer probable cause to initiate a traffic stop); *see also Retzlaff v. City of Cumberland*, No. 09-CV-692-SLC, 2010 WL 1780338, at *6 (W.D. Wis. May 3, 2010) (finding that there was probable cause for a traffic stop after the officer used a visual estimation and dash-mounted radar of the plaintiff's speed).

Like the officer in *Lewis*, Defendant observed what he believed were traffic violations and acted to confirm his observations. Defendant first observed Plaintiff violating the posted speed limit of 70 miles per hour and began traveling behind Plaintiff, pacing his patrol vehicle with Plaintiff's car. [DE 16 at 1, ¶ 3]. After doing so, both Defendant's "speedometer and [dash-mounted] radar" showed that Plaintiff was driving at 77 miles per hour. [DE 16 at 1, ¶ 3]. These facts suggest that Defendant had not only reasonable suspicion, but also probable cause to initiate a traffic stop.

Still, Plaintiff insists that he had cruise control set to the speed limit of 70 mph and could not have been speeding. [DE 17 at 3, ¶ 1]. But the use of cruise control has routinely been considered insufficient. *See Retzlaff*, No. 09-CV-692-SLC, 2010 WL

1780338, at *6 (citing *Deville v. Marcantel*, 567 F.3d 156, 165 (5th Cir. 2009) ("despite [a] plaintiff's protests that she was driving within the speed limit, the '[u]ncontradicted testimony that [an officer's] radar gun indicated that [plaintiff] was speeding' is normally enough to establish probable cause.'").[5] Without more, Plaintiff's assertion that he was using cruise control set to the speed limit of 70 mph does not create a material dispute of fact that can overcome Defendant's Motion for Summary Judgment. *See Fells v. Adams*, No. 11 C 47, 2012 WL 2872118, at *3 (N.D. Ill. July 11, 2012) (a defense that plaintiff used cruise control was not enough to overcome defendant's argument that his radar-gun detected plaintiff traveling below the speed limit when defendant also saw plaintiff violate lane usage.)

What's more, Defendant also observed Plaintiff improperly use his turn signal twice, providing another ground to pull him over. In *Abbas v. City of Hobart*, the plaintiff, Devonte Abbas, was driving between 5 and 10 miles below the speed limit when Officer Kissee, employed by the City of Hobart, began to follow him. *Abbas*, 2024 WL 3508640, at *1. Abbas ended up driving past his intended destination and pulled into an apartment complex to turn around. *Id.* After turning around, Abbas turned into his intended destination. But when making this turn, Officer Kisee observed Abbas activate his left turn signal, and then his right turn signal, all less than 200 feet of making the turn. Officer Kissee then pulled him over. *Id.* Officer Kissee explained that

---

[5] Probable cause is no longer required for a traffic stop. An officer must only have reasonable suspicion that a minor traffic offense has been committed. A traffic violation need not be committed, but only that the officer has an objective basis for a reasonable belief that the law was broken. *Lewis*, 920 F.3d at 489 (citing *Cashman*, 216 F.3d at 587).

he assessed the distance by using his "reasonable judgment as to what 200 feet is" and that he has "walked out 200 feet just to get an idea" of what the distance looks like. *Id.* at 3. But, like Plaintiff does here, Abbas insisted that he "'signaled to turn…more than 200 feet prior to the turn and at no time…did [he] turn [his] left turn signal on.'" *Id.* at 3. Despite this dispute, the court in *Abbas* found that "[e]ven taking this statement as true, all it would establish is that [p]laintiff complied with the turn signal statute at the time, which is not the key inquiry…[T]he key inquiry is whether there was an objective basis for [the officer's] reasonable belief." *Id.* at 3-4.  (citing *United States v. Simon*, 937 F.3d 820, 829 (7th Cir. 2019)). The court in *Abbas* thus found that there was "not enough evidence in the record for a reasonable jury to decide that the initial stop was unconstitutional." *Id.*

Similarly, here, Defendant observed Plaintiff's improper turn signal usage. At the time of the incident giving rise to this case Indiana law required for a turn signal to be used for at least 300 feet when traveling 50 mph or above. Defendant asserts that he saw Plaintiff "merge quickly" from the far inside lane to the middle lane "without signaling 300 feet prior to changing lanes." [DE 16 at 1, ¶ 2]. Defendant also asserts that while pacing with Plaintiff's vehicle, Defendant observed Plaintiff "merge to the far outside lane of travel…again, without signaling his intention to change lanes for 300 feet prior to changing lanes." [*Id.* at 2, ¶ 4]. As *Abbas* shows, such an observation provides an objective basis for Defendant to reasonably suspect that a traffic violation has been committed. Thus, Plaintiff's assertion that he properly used his turn signal is not enough evidence for a jury to decide that the traffic stop was unconstitutional.

Based on these facts, the Court can only find that Defendant had reasonable suspicion to initiate a traffic stop against Plaintiff.

### ii.    Length of Stop

The Court's analysis does not end there, however, as Plaintiff also contends that Defendant violated his Fourth Amendment rights by unreasonably prolonging the traffic stop.

> [A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete [the] mission' of issuing a ticket for the violation.

*Rodriguez*, 575 U.S. at 350 (citing *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). "A seizure for a traffic violation justifies a police investigation of that violation. '[A] relatively brief encounter,' a routine traffic stop is 'more analogous to a so-called "*Terry* stop" . . . than to a formal arrest.'" *Id.* at 354 (citing *Knowles v. Iowa*, 525 U.S. 113, 117 (1998)). "Like a *Terry* stop, the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop[.]" *Id.* (citing *Caballes*, 543 U.S. at 407). There is no "'rule of thumb that relies on the number of minutes any given stop lasts.'" *United States v. Cole*, 21 F.4th 421, 433 (7th Cir. 2021) (citing *United States v. Gholston*, 1 F.4th 492, 496 [] (7th Cir. 2021)). The tolerable duration is also determined by "related safety concerns." *Rodriguez*, 575 U.S. at 354. "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id.* But "[a]s part of making these ordinary inquiries, no one disputes that an officer may ask questions unrelated to the stop, and

even conduct a dog sniff, if doing so does not prolong the traffic stop." *Cole,* 21 F.4th at 429. Still, not all inquiries will qualify as ordinary inquiries: "measure[s] aimed at detect[ing] evidence of ordinary criminal wrongdoing' do not pass muster.'" *Id.* at 440 (Hamilton, J., dissenting) (quotations deleted) (citing *Rodriguez,* 575 U.S. at 355).

Plaintiff contends that even a six-minute delay can be unreasonable under the 4th Amendment, citing *United States v. Cole*, 994 F.3d 844 (7th Cir.), *reh'g en banc granted*, *opinion vacated*, 849 F. App'x 598 (7th Cir. 2021), and *on reh'g en banc*, 21 F.4th 421 (7th Cir. 2021). But Plaintiff fails to mention that this decision was vacated. [DE 17 at 8]. Rather, the court's subsequent decision in *Cole* supports Defendant's argument that the traffic stop was not unreasonably prolonged. There, an officer pulled over the defendant for following another car too closely. 21 F.4th at 424. "During the brief roadside detention…the trooper questioned Cole about his license, registration, and travel plans." *Id.* The type of questions asked by the officer included why Cole had an Arizona license but a California registration and who he worked for. *Id.* at 432. "Cole's answers struck the trooper as evasive, inconsistent, and improbable." *Id.* at 424. This led the officer to have many follow-up questions and caused him to suspect Cole of "trafficking drugs." *Id.* Because the traffic stop was initiated on the interstate, the officer asked Cole to drive to a nearby gas station where he could issue Cole a warning. *Id.* at 427. This was requested within 9 minutes of the beginning of the stop. *Id.* Then, at the gas station, the officer called a K9 unit, and who found large quantities of drugs in Cole's vehicle. *Id.* On appeal, the court considered whether the officer "unlawfully prolonged the traffic stop by inquiring about Cole's itinerary." *Id.* at 428. The court

16

acknowledged that "'[a]n officer's inquiries into matters unrelated to the justification for the traffic stop…do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop.'" *Id.* at 429 (citing *Arizona v. Johnson*, 555 U.S. 323, 333 (2009)). Still, the court could not determine whether the officer's questioning prolonged the stop because the record was undeveloped on that point. *Id.*. The court instead determined whether the officer's travel plan and itinerary questions "fell within the mission of the stop, such that they could not have prolonged it in the first place." *Id.* at 429. On this point, the court found that the officer's questioning did fall within the scope of the mission of the traffic stop and thus there was no violation of the Fourth Amendment. *Id.* at 433, 435.

Whether the traffic stop was unreasonably prolonged is similarly undeveloped in the record of this case. Plaintiff does little more than offer conclusory statements in support of his claim. Plaintiff states that the "stop and the time in the patrol [vehicle] was approximately 25 minutes" but produces no other evidence to support this. [DE 17 at 5–6, ¶ 7]. In contrast, Defendant includes a copy of a Calls For Service View Call Report, which shows the time that Defendant called for dispatch and when it was cleared. [DE 15-2]. Plaintiff argues that the Calls for Service View Call Report merely reflects the time that Defendant "called dispatch" and not "the actual duration of the stop." [DE 17 at 5–6, ¶ 7]. But Plaintiff does not assert that Defendant did not call for dispatch at the beginning of the traffic stop which could have offered some support for Plaintiff's claim that the traffic stop was longer than 10 minutes. What's more, Plaintiff does not allege that any questions of Defendant were unnecessary or unrelated to the

scope of the traffic stop. In fact, Plaintiff also states that once he was in Defendant's patrol vehicle that Plaintiff himself asked Defendant questions. [DE 17-1 at 4, ¶ 18].

Plaintiff also contends that the stop was unreasonably prolonged by claiming that there was no reason for him to sit inside the patrol vehicle because Defendant needed nothing other than his "driver's license and vehicle rental agreement" to complete the traffic stop. [DE 17 at 5–6, ¶ 7]. But this does not support Plaintiff's argument because it is customary for police officers to invite people whom they have initiated a traffic stop against to sit in their patrol vehicle while they issue citations.[6] Moreover, Defendant asserts that Plaintiff did not vocalize any "objection or concern" to sitting in the patrol and instead "sat in the patrol [vehicle] and…engaged in general conversation about [his] travels." [DE 15 at 7–8]. Plaintiff does not dispute this. Even if the entire duration of the traffic stop was longer than 10 minutes and lasted about 25 minutes, Plaintiff does not show that the traffic stop lasted longer than what was reasonably necessary for Defendant to issue a warning. *Rodriguez*, 575 U.S. at 350. As made clear above in *Cole*, general conversation is permissible during a traffic stop even if such conversation is unrelated to the traffic stop. *Cole*, 21 F.4th at 429. Such conversation does not deem a traffic stop to be unreasonably prolonged. Thus, even with the facts being construed in a light most favorable to Plaintiff, Plaintiff fails to meet

---

[6] An officer offering or requesting that a person whom they are conducting a traffic stop against sit in their patrol vehicle during the traffic stop is common practice. *See United States v. Curiel*, No. 3:24-CR-00022-CCB-SJF, 2024 U.S. Dist. LEXIS 183608, at *2 (N.D. Ind. Oct. 8, 2024).

his burden of showing that there is a genuine dispute of material fact relating to the duration of the traffic stop. *Anderson*, 477 U.S. at 248.

In sum, the undisputed material facts show that there was reasonable suspicion for the traffic stop and that the traffic stop was not unreasonably prolonged. Accordingly, Defendant's Motion for Summary Judgment on Plaintiff's Fourth Amendment claims is granted.

### b.    Fourteenth Amendment

Plaintiff contends that Defendant discriminated against him because Defendant pulled him over due to his race. In contrast, Defendant argues that he "did not utilize impermissible classification when determining to stop or briefly detain the Plaintiff…[and he] had no familiarity whatsoever with [] Plaintiff…prior to the traffic incident." [DE 15 at 10].

The Fourteenth Amendment's Equal Protection clause prohibits and provides a basis for objection to the selective enforcement of the law on considerations such as race. *Chavez v. Ill. State Police*, 251 F.3d 612, 635 (7th Cir. 2001) (citing *Whren v. United States*, 517 U.S. 806, 813 (1996)). "To show a violation of the Equal Protection Clause, plaintiff[] must prove that the defendant['s] actions had a discriminatory effect and were motivated by a discriminatory purpose." *Id.* at 635–36. "To prove discriminatory effect, the plaintiff[] [is] required to show that [he is a] member[] of a protected class, that [he is] otherwise similarly situated to members of the unprotected class, and that plaintiff[] [was] treated differently from members of the unprotected class." *Id.* at 636. Put another way, a plaintiff must show that a defendant "selected or reaffirmed a

19

particular course of action at least in part 'because of'…its adverse effects upon an

identifiable group." *Conley v. United States*, 5 F.4th 781, 789 (7th Cir. 2021) (citing

*McCleskey v. Kemp*, 481 U.S. 279, 298 (1987)).

   Plaintiff states that when Defendant approached his vehicle, he did not offer a

"race neutral reason" for asking Plaintiff to sit in his patrol vehicle, which violates the

Fourteenth Amendment. [DE 17 at 5, ¶ 6]. Thus, Plaintiff seems to suggest that there

was a violation of his fourteenth Amendment Equal Protection right based on the

assertion that the traffic stop was unlawful under the Fourth Amendment. [DE 1 at 3, ¶

9]. Such a claim must fail when a plaintiff fails to show that a defendant's actions had

either a discriminatory effect or a discriminatory purpose. *Chavez*, 251 F.3d at 635–36.

   *Jones v. City of Elkhart* is instructive. 737 F.3d 1107, 1109 (7th Cir. 2013). In *Jones*,

the plaintiff was driving from Elkhart, Indiana, to South Bend, Indiana around 2:00 a.m.

when he was stopped by Elkhart police officers for speeding. During the traffic stop, the

officers suspected that Jones may have been under the influence of drugs or alcohol. *Id.*

The officers had Jones use a portable breath test device which determined that his blood

alcohol content was 0.096%. *Id.* Jones then did a "walk and turn test" but could not keep

his balance steady and was swaying back and forth. *Id.* at 1109–1110. As a result, Jones

was arrested, among other reasons, for operating a motor vehicle while intoxicated. *Id.*

at 1110. Jones subsequently filed suit, alleging, among other things, that the traffic stop

lacked probable cause and was based on racial animus. *Id.* The court first found that

there was probable cause for the stop. *Id.* The court also acknowledged that Jones'

"equal protection claim hinge[s] . . . in part, on the fact that his traffic stop and arrest

occurred without any probable cause." *Id.* at 1116-17. With probable cause found, and no other "mention of racial profiling or injury to rights governed by the Equal Protection Clause," the court considered Jones' equal protection claim waived. *Id.* at 1113.

As in *Jones*, here, the traffic stop here was reasonable. Moreover, Plaintiff does not argue that Defendant's initiation of or conduct during the traffic stop produced an effect of racial discrimination, nor does he argue that Defendant acted to discriminate against Plaintiff based on race. Instead, Plaintiff merely states that "[i]t is well established that racially discriminatory enforcement motivated by a discriminatory intent violates the 14th Amendment" and that Defendant knew that Plaintiff was African American when he initiated the stop. [DE 17 at 9]. But to overcome a motion for summary judgment, Plaintiff cannot rest on the allegations or denials contained in his pleadings. Rather, he must present sufficient evidence to show the existence of a Fourteenth Amendment violation. *Celotex*, 477 U.S. at 322–23. Because Plaintiff does not point to any evidence of discrimination outside of his own conclusory statements, the disagreement about when Defendant noticed Plaintiff's race is not material.

Thus, the Court grants Defendant's Motion for Summary Judgment on Plaintiff's Fourteenth Amendment claim.

### 2.    Qualified Immunity

Defendant also contends that summary judgment is warranted because he is entitled to qualified immunity. The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate a "clearly

established" constitutional or statutory right. *McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010). Once a defendant raises a qualified immunity defense, the plaintiff carries the burden of defeating it. *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 359 (7th Cir. 2005). Evaluating this defense requires that the court make two inquiries: (1) whether the facts—which the court views in the light most favorable to Plaintiff—show a violation of a statutory or constitutional right, and (2) whether that right was "clearly established" at the time of the alleged violation. *Williams v. Chicago*, 733 F.3d 749, 758 (7th Cir. 2013). "If either inquiry is answered in the negative, the defendant official is entitled to summary judgment." *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014) (emphasis in original).

As discussed above, the facts here do not show that Defendant violated Plaintiff's rights. With the first inquiry answered in the negative, Defendant is entitled to summary judgment. *Id.*

## III. CONCLUSION

For these reasons, Defendant's Motion for Summary Judgment is **GRANTED.** [DE 14]. As the Court has ruled on the motion without the need for oral argument, Defendant's motions for a hearing [DE 20, DE 22] are **DENIED as moot**. *See* N.D. Ind. L.R. 56-1(g). The Clerk is **DIRECTED** to terminate this case.

**SO ORDERED** this 24th day of January, 2025.

s/Scott J. Frankel
Scott J. Frankel
United States Magistrate Judge